**UNITED STATES of America,**
**Plaintiff,**

v.

**Gregory Reese FISHER, Defendant.**

**No. 02–40078–01–SAC.**

United States District Court,
D. Kansas.

Oct. 2, 2002.

---

**19.** None of the parties dispute that Delaware law embodies the same "reasonable certain-

ty" principle.

Ronald E. Wurtz, Office of Federal Public Defender, Dwight L. Miller, Topeka, KS, for Defendant.

James A. Brown, U.S. Attorney, Office of United States Attorney, Topeka, KS, for Plaintiff.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on the defendant's pretrial motion to suppress (Dk.22). The government has filed a response opposing this motion. (Dk.27). On August 21, 2002, the court heard evidence on the motion to suppress as well as counsels' arguments on the same. Having reviewed all matters submitted and researched the law relevant to that motion, the court is ready to rule.

## INDICTMENT

On June 20, 2002, the grand jury returned a two-count sealed indictment against the defendant Gregory Reese Fisher. Count one charges that on May 8, 2002, the defendant knowingly and unlawfully possessed the listed chemical of ephedrine or pseudoephedrine with the intent to manufacture the controlled substance of methamphetamine in violation of 21 U.S.C. § 841(c)(1). Count two charges that on May 8, 2002, the defendant attempted to manufacture more than 50 grams of actual methamphetamine in violation of 21 U.S.C. § 846.

## FACTS

Around 9:10 a.m. on May 8, 2002, Investigator Gary Hanus with the I–135/I–70 Drug Task Force ("DTF") received a telephone call from an employee with the Target store in Salina, Kansas, about a person attempting to steal ten packages of lithium batteries. Hanus arrived at the store and contacted Diane Dowell, the assets protection team leader for this Target store. Ms. Dowell advised him of the following. A store employee had alerted Ms. Dowell that a male customer in the electronics department was trying to conceal an item. After receiving a description of the customer and then locating him, Ms. Dowell began visual surveillance of him. The customer walked past the checkout lanes and into the food section eventually turning down the snack aisle. As Ms. Dowell walked past this same aisle, she observed the customer with his hand extended upward into a shelf and when the customer saw Ms. Dowell he quickly pulled his hand away from the shelf. The customer positioned his body to prevent Ms. Dowell from seeing what he had apparently placed on the shelf. When the customer eventually left that aisle, she inspected the area where she had seen the customer reaching and found ten packages of lithium batteries tucked behind some snack food items. Each package contained at least one or two lithium batteries. Knowing that lithium is used in the manufacture of methamphetamine, she instructed another store employee to call the DTF.

DTF Investigator Hanus and Ms. Dowell continued surveillance of the customer at the Target store. The customer remained in the store for another forty-five

minutes wandering about the store but spending a lot of his time in the shoe section. The customer eventually purchased a pair of shoes and apparently other items before leaving the store. Ms. Dowell testified that it is Target store's practice after closing to have employees straighten shelves and return misplaced merchandise.

After the male customer left the Target store, Investigator Hanus observed him walk north and cross a small median towards the Sam's store. The customer placed his three Target store bags in the vestibule outside the Sam's store entrance and walked inside. Hanus and another agent followed the customer around the Sam's store for about one-half hour. It appeared to Hanus that the customer was conducting counter-surveillance as he kept looking over his shoulder to see if someone was following him. The agents then sat down near the cold medicine aisle and watched as the customer walked past the aisle twice without going down it. After approximately one hour, customer left the Sam's store and headed in the direction of the Wal–Mart store that was across the road.

Lieutenant Joseph Garman approached the defendant in the Sam's Club parking lot. As Agent Hanus approached, he heard the customer say that he did not have to reveal his name. Lieutenant Joseph Garman explained that he was a shoplifting suspect and did have to identify himself. The customer said his name of Greg Fisher of Belleville, Kansas. In response to the officer's questions about the attempted shoplifting, the defendant denied stealing or attempting to steal anything from Target.

During this questioning, a third agent on the scene, Agent Steve Garman, recalled that the defendant had been seen on a Target store surveillance videotape sub-

mitted to the DTF approximately one month ago. These surveillance videotapes are used by DTF to identify people buying cold pills or lithium batteries and then furnished to other law enforcement agencies to assist them in developing cases. As for this particular videotape, Agent Hanus remembered that he had ordered other officers to forward the videotape to Detective Vince Crough who was a drug investigator with the sheriff's department in Republic County where Belleville is located. When Agent Hanus mentioned Detective Crough's name in response to Agent Garman's comment about the videotape, Mr. Fisher said he knew Detective Crough.

At this point, Agent Hanus telephoned Detective Crough and asked about Mr. Fisher and the videotape. Detective Crough said that Mr. Fisher and his associates were suspected of being heavily involved in methamphetamine and were being investigated for the same. Detective Crough also told Agent Hanus that Mr. Fisher would be operating a blue or yellow Cadillac. Motivated by officer safety issues, Agent Hanus then asked Mr. Fisher if he had any weapons on him and patted him down. Agent Hanus did not detect any weapons but felt car keys in Fisher's back left pants pocket. Agent Hanus asked to see the keys, and Mr. Fisher handed them over. The keys were for a General Motors model car which was consistent with Detective Crough's information that Mr. Fisher operated a Cadillac. When agents resumed questioning about the attempted shoplifting of lithium batteries, Mr. Fisher requested an attorney.

Five to ten minutes after their encounter began in the parking lot, the agents placed Mr. Fisher under arrest. A city patrol car arrived, and agents handcuffed the defendant and began placing him in the patrol car when he told agents that he wished to cooperate with them. Agents

asked where his vehicle was located, and the defendant said it was in the Target store parking lot. Upon inspecting the lot, agents found a blue Cadillac and could see laying on the front passenger-side floorboard a plastic sack that was completely filled with cold pill boxes.

Knowing that the pills were commonly used in the manufacture of methamphetamine, the agents had the blue Cadillac towed to the Salina Police Department and obtained a search warrant for the vehicle. The agents searched the car finding actual methamphetamine, marijuana, and 4,422 cold pills containing pseudoephedrine.

## ARGUMENTS

The defendant contends that any reasonable suspicion justifying a *Terry* stop ended after he identified himself and denied any attempt to steal anything. The defendant contends the officers were not justified in conducting a pat down and were without probable cause for arresting him. The defendant further argues the officers exceeded their authority under Kansas law in conducting a warrantless arrest on a misdemeanor offense when the officers had not observed the offense being committed. Relying on K.S.A. 22–2401(c)(2), the defendant argues that the officers needed not only probable cause to believe that the defendant committed a misdemeanor but that they also needed probable cause to believe that: (1) the defendant would not be apprehended or evidence would be irretrievably lost without an immediate arrest; (2) the defendant would cause injury to self or others or damage property without an immediate arrest; (3) the defendant had intentionally inflicted bodily harm to another; or (4) the defendant had committed the crime within the officer's view. In the absence of these circumstances, the defendant contends his warrantless arrest was unlawful and tainted all statements and evidence flowing from it.

The government responds that the agents did not exceed the parameters of a *Terry* stop and that they had probable cause to arrest the defendant when they did. The government denies that the lawfulness of the arrest is judged by the terms of a Kansas statute rather than federal law.

## RELEVANT LAW

As established by Supreme Court precedent, there are three general types of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, [which are] the most intrusive ... and [are] reasonable only if supported by probable cause." *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir.1996) (citations omitted). In deciding if a police-citizen encounter amounts to a seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir.1999) (quotation and citation omitted), *cert. denied*, 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000).

█ An officer making an investigative detention or a *Terry* stop must possess articulate reasonable suspicion. *United States v. Carhee*, 27 F.3d 1493, 1496 and n. 2 (10th Cir.1994). Reasonable suspicion is one that would "warrant a man of reasonable caution in the belief that [a stop] was appropriate." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quotation and citation omitted).

Police officers cannot rely upon an "unparticularized suspicion or hunch." *Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994). Whether an officer possesses the requisite articulate suspicion depends on the totality of the circumstances. *United States v. Salzano*, 149 F.3d 1238, 1242 (10th Cir.1998), *opinion amended and superseded*, 158 F.3d 1107 (10th Cir.1998). "While the necessary level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, the Fourth Amendment requires some minimal level of objective justification." *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997) (quotation and citation omitted), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998). The court considers both the quantity and quality of the evidence when evaluating whether there is reasonable suspicion.

The court looks at the factors enumerated at the suppression hearing, "both individually and in the aggregate, and determine[s] whether, under the totality of the circumstances, those factors give rise to a reasonable suspicion of criminal activity." *United States v. Salzano*, 158 F.3d at 1111 (citation omitted). The court "judge[s] the officer's conduct in light of common sense and ordinary human experience." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir.1997) (citation omitted). "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Gutierrez–Daniez*, 131 F.3d at 941 (quotation omitted).

 Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'

*United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229, (1983)). It must be temporary, and its scope must be carefully tailored to its underlying justification. *United States v. Gutierrez–Daniez*, 131 F.3d at 942. A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter. *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998).

In *Terry*, the Supreme Court held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon." 392 U.S. at 24, 88 S.Ct. 1868; *see also United States v. Hishaw*, 235 F.3d 565, 570 (10th Cir.2000) (that the defendant had been seen distributing drugs in hand-to-hand transactions indicated that he might be armed and dangerous), *cert. denied*, 533 U.S. 908, 121 S.Ct. 2254, 150 L.Ed.2d 241 (2001); *United States v. Duncan*, 131 F.3d 894, 898 (10th Cir.1997) (concluding that officers had a reasonable suspicion that the defendant was engaged in on-going criminal activity and therefore could order him to get out of car and conduct a pat-down search); *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir.1996) (holding that, during an investigatory detention, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo); *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir.1998) (holding that "when the officer has a reasonable suspicion that

illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others").

■ A warrantless arrest must be supported by probable cause. *See United States v. Vazquez–Pulido,* 155 F.3d 1213, 1216 (10th Cir.), *cert. denied,* 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 356 (1998). An officer has probable cause to arrest if, under the totality of circumstances, he "learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *Vazquez–Pulido,* 155 F.3d at 1216 (quoting *United States v. Guerrero–Hernandez,* 95 F.3d 983, 986 (10th Cir.1996)). Although probable cause need not be based on facts sufficient for a finding of guilt, it requires "more than mere suspicion." *Id.* (citing *United States v. Hansen,* 652 F.2d 1374, 1388 (10th Cir.1981)). " 'Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer.' " *United States v. Snow,* 82 F.3d 935, 942 (10th Cir.1996) (quoting *United States v. Morgan,* 936 F.2d 1561, 1568 (10th Cir.1991), *cert. denied,* 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992)); *see generally Ornelas v. United States,* 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (indicating "that a police officer may draw inferences based on his own experience in deciding whether probable cause exists"); *United States v. Santana–Garcia,* 264 F.3d 1188, 1192 (10th Cir.2001) ("We measure probable cause against an objective standard and evaluate it in relation to the circumstances as they would appear to a prudent, cautious and trained police officer.").

■ "When police officers obtain information from an eyewitness or victim establishing the elements of a crime, the information is almost always sufficient to provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible." *Pasiewicz v. Lake County Forest Preserve Dist.,* 270 F.3d 520, 525 (7th Cir.2001) (citations omitted). Officers may not rely solely on observations of a security guard when a videotape of the conduct is both known and readily accessible to the officers. *Baptiste v. J.C. Penney Co.,* 147 F.3d 1252, 1257 n. 8 (10th Cir.1998).

■ It is well established that in a federal prosecution state law cannot serve as a basis for the suppression of evidence. *See On Lee v. United States,* 343 U.S. 747, 754–55, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *United States v. Price,* 75 F.3d 1440, 1443 (10th Cir.), *cert. denied,* 517 U.S. 1239, 116 S.Ct. 1889, 135 L.Ed.2d 183 (1996); *United States v. Mitchell,* 783 F.2d 971, 973 (10th Cir.), *cert. denied,* 479 U.S. 860, 107 S.Ct. 208, 93 L.Ed.2d 138 (1986). The Tenth Circuit has summarized the governing law as follows:

> In any event, "[i]t is ... well established in this circuit that 'in federal prosecutions the test of reasonableness in relation to the Fourth Amendment ... must be determined by Federal law even though the police actions are those of state police officers.' " *United States v. Le,* 173 F.3d 1258, 1264 (10th Cir.1999) (quoting *United States v. Miller,* 452 F.2d 731, 733 (10th Cir.1971)). This is because " 'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.' " *Id.* (quoting *United States v. Wright,* 16 F.3d 1429, 1437 (6th Cir.1994)). Thus, "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under

the Federal Constitution were not offended." *Id.* (citation omitted).

*United States v. Dickerson,* 195 F.3d 1183, 1187 (10th Cir.1999). Thus, in determining the validity of the officers' warrantless arrest of the defendant, the court looks exclusively at the case law interpreting and applying the Fourth Amendment. *See, e.g., United States v. Thompson,* 16 Fed. Appx. 340, 343, 2001 WL 820905, at *2 (6th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 634, 151 L.Ed.2d 554 (2001).

■ The federal law on warrantless misdemeanor arrests remains somewhat unsettled. Recently, the Supreme Court in *Atwater v. City of Lago Vista,* 532 U.S. 318, 323, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001), held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." The Supreme Court, however, expressly avoided deciding the issue relevant here:

> We need not, and thus do not, speculate whether the Fourth Amendment entails an "in the presence" requirement for purposes of misdemeanor arrests. Cf. *Welsh v. Wisconsin,* 466 U.S. 740, 756, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (White, J., dissenting) ("[T]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment.").

532 U.S. at 340 n. 11, 121 S.Ct. 1536. The Seventh Circuit recently summarized the Supreme Court's decisions in this area, as well as the decisions from sister circuits:

> The Supreme Court has never held that a police officer violates the Fourth Amendment merely by arresting someone without a warrant for a misdemeanor offense which did not occur in the officer's presence and/or did not involve

a breach of the peace. Rather, when determining the constitutionality of a warrantless arrest for a criminal offense, the Court has repeatedly focused its inquiry on the existence of probable cause for the arrest. *See, e.g., Gerstein v. Pugh,* 420 U.S. 103, 111–12, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). While "the Court has expressed a preference for the use of arrest warrants when feasible," *Gerstein,* 420 U.S. at 113, 95 S.Ct. 854, the Court has never elevated this judicial preference to a per se rule mandating warrants for all arrests irrespective of the existence of probable cause. *See, e.g., [United States v.] Watson,* 423 U.S. [411] at 417, 96 S.Ct. 820, 46 L.Ed.2d 598 [ (1976) ] (stating that " 'such a requirement would constitute an intolerable handicap for legitimate law enforcement' " (citation omitted)). Indeed, in *Gerstein,* the court noted that it "has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant," 420 U.S. at 113, 95 S.Ct. 854, and in the intervening years since *Gerstein* it has strayed from this principle only once, when it imposed a warrant requirement for arrests made in a suspect's home. *See Payton v. New York,* 445 U.S. 573, 585–86, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (holding that, absent exigent circumstances, the Fourth Amendment prohibits warrantless, nonconsensual entry into a suspect's home in order to make a felony arrest—notwithstanding the existence of probable cause to arrest)....

> . . . .

> Moreover, several of our sister circuits have squarely addressed Woods' argument, and they have uniformly held or stated that the common law "in the presence" rule is not part of the Fourth Amendment. *See Vargas–Badillo˙ v.*

*Diaz–Torres,* 114 F.3d 3, 6 (1st Cir.1997) (upholding a grant of summary judgment for defendant police officer on a § 1983 claim alleging illegal arrest, and stating that "[t]o date, neither the Supreme Court nor this circuit ever has held that the Fourth Amendment prohibits warrantless arrests for misdemeanors not committed in the presence of arresting officers"); *United States v. Smith,* 73 F.3d 1414, 1416 (6th Cir.1996) (stating that the requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest "is not mandated by the Fourth Amendment; it is merely a rule of the common law"); *Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir.1995) (rejecting a Fourth Amendment challenge to a misdemeanor arrest when probable cause existed, and holding that the plaintiff's "right as an alleged misdemeanant to be arrested only when the misdemeanor is committed in the presence of the arresting officer [is] not grounded in the federal Constitution and will not support a § 1983 claim"); *Fields v. City of South Houston, Texas,* 922 F.2d 1183, 1189 (5th Cir.1991) (ruling that "[t]he United States Constitution does not require a warrant for misdemeanors not occurring in the presence of the arresting officer"); *Barry v. Fowler,* 902 F.2d 770, 772 (9th Cir.1990) (ruling that "[t]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment"); *Street v. Surdyka,* 492 F.2d 368, 372 (1974) (rejecting a constitutional challenge to a warrantless misdemeanor arrest and stating that "[w]e do not think the fourth amendment should now be interpreted to prohibit warrantless arrests for misdemeanors committed outside an officer's presence.... The fourth amendment pro-

tects individuals from unfounded arrests by requiring reasonable grounds to believe a crime has been committed. The states are free to impose greater restrictions on arrests, but their citizens do not thereby acquire a greater federal right"); *see also Scott v. District of Columbia,* 101 F.3d 748, 754 (D.C.Cir.1996) (noting that several circuits agree that "the Fourth Amendment does not incorporate the common-law presence requirement for misdemeanor arrests, and that no cause of action exists under § 1983 unless the arresting officer lacked probable cause to believe a crime was committed," but declining to decide the issue).

Therefore, given the weight of Supreme Court authority on this issue, the overwhelming consensus of the circuits, and our similar holding in *Ricci,* we reject Woods' invitation to constitutionalize the framing-era common law of misdemeanor arrests and to overturn any Illinois state or municipal laws which abrogate it.

*Woods v. City of Chicago,* 234 F.3d 979, 992, 995 (7th Cir.2000), *cert. denied,* 534 U.S. 955, 122 S.Ct. 354, 151 L.Ed.2d 268 (2001). The Tenth Circuit appears to have required only probable cause in applying the Fourth Amendment to warrantless arrests. *See, e.g., Baptiste v. J.C. Penney Co.,* 147 F.3d 1252, 1256 (10th Cir.1998) (arrest of shoplifting suspect but does not mention whether a felony or misdemeanor); *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1434 (10th Cir.1984) (arrest of petty larceny suspect), *cert. granted and vacated on other grounds sub nom., City of Lawton, Okla. v. Lusby,* 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985). The relevant law as pronounced in current Supreme Court precedent, as decided by other federal circuits, and as applied within the Tenth Circuit upholds the constitutionality of a warrantless misdemeanor arrest

based on probable cause though the offense was not committed in the officer's presence.

**ANALYSIS**

 The court has no difficulty concluding that the agents had reasonable suspicion to believe that the defendant Fisher had attempted to shoplift lithium batteries at the Target store and that this justified the investigative detention of the defendant Fisher in the Sam's parking lot. Agent Hanus was aware of the circumstances leading to Ms. Dowell's decision to involve the DTF in this shoplifting incident. After Ms. Dowell started following Mr. Fisher upon a report of possible shoplifting in the electronics department, she observes him in the snack aisle. When Fisher sees her, he quickly removes his hand from an upper shelf and turns his body so as to block her view. Ms. Dowell eventually checks out the shelf area where Fisher had his hand and finds ten packages of lithium batteries stuck behind a snack item. The court has no difficulty in distinguishing this behavior from the common situation of a customer simply changing his or her mind about a purchase and unloading it anywhere convenient. First, the decision to take ten packages of lithium batteries is hardly consistent with impulse shopping. Second, Mr. Fisher's behavior upon being seen is not what one would expect from a shopper only changing his mind about a purchase and laying aside the unwanted items. Third, Mr. Fisher's placement of the batteries indicates either that he did not want to be connected to the batteries or that he wanted to retrieve them sometime later. Fourth, it is unlikely that these batteries may have been left there by another customer, because Target requires employees each night to check for misplaced merchandise and the batteries were found a relatively short time after Target opened that morning. Finally, because lithium is an ingredient used in the manufacture of methamphetamine, Mr. Fisher would have a reason for unlawfully shoplifting this large number of lithium batteries rather than lawfully purchasing them and bringing attention to himself. Besides these circumstances, the defendant Fisher went to the Sam's store and engaged in what the agents believed to be counter-surveillance. On the weight of these circumstances, the agents had articulate reasonable suspicion to conduct an investigative detention.

 The court is satisfied that the agent's investigative detention did not last longer than necessary and did not exceed the scope of what was necessary to effectuate the purpose of the stop. During their questioning of Mr. Fisher, the agents recognized him as someone who had been identified and seen purchasing pseudoephedrine tablets on Target's surveillance videotapes last month. The agents also recalled the tape had been sent to the drug investigator in the Republic County Sheriff's Department, Detective Vince Crough. The agents telephoned Detective Crough who told them that the defendant and his associates were subjects of an investigation and were believed to be heavily involved in methamphetamine. The detention was extended by several more questions about the attempted shoplifting and a brief pat-down search. Following which, the defendant requested an attorney and the agents placed him under arrest. The length and scope of this detention was reasonably related to the purpose of the stop, that was, the investigation of an attempted shoplifting incident involving items used in the manufacture of methamphetamine.

 Upon obtaining Fisher's identity, recalling a store surveillance videotape that linked Fisher to prior purchases at Target of pseudoephedrine which is another ingredient used in the manufacture of

methamphetamine, and receiving information from law enforcement officers that Fisher was heavily involved with methamphetamine, the agents had probable cause to believe that Fisher attempted to shoplift the lithium batteries. This additional information eliminated the reasonable likelihood of other possible innocent explanations for Fisher's suspicious actions at Target. Now the agents have reasonably trustworthy information leading them to believe that Fisher wanted to obtain a number of lithium batteries for use in the manufacture of methamphetamine without notifying the store and other authorities of his intentions and tried to accomplish the same by shoplifting the lithium batteries from the electronics department in Target. Wary of being caught, Fisher later secretly jettisoned the batteries and acted as if consciously guilty when he realized someone had observed him. Fisher's behavior afterwards was consistent with efforts to diffuse that suspicion created by his earlier actions and to detect if he had been successful in that regards. In short, the agents had reasonably trustworthy information that lead them to reasonably believe that the defendant's actions were consistent with criminal conduct and that the defendant had a motive for engaging in the same.[1] The agents had probable cause to arrest the defendant for attempted shoplifting.

IT IS THEREFORE ORDERED that defendant's motion to suppress (Dk.22) is denied.

---

[1] In deciding the matter of probable cause, the court has not considered the inconsistency between the car keys found on the defendant during the pat-down search and the defendant's story that he was waiting for a friend to give him a ride home. The court upholds the pat-down search as a legitimate search incident to arrest, because the agents effectuated the arrest shortly after this pat-down search. *United States v. Lugo*, 170 F.3d 996, 1003 (10th Cir.1999) (citing in part *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)).